## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANA LOPEZ, as the Personal Representative
of the Estate of Luis Lopez, Deceased,

       Plaintiff,

v.                                          No. CIV 19-0855 RB/JHR

THE CITY OF BELEN, SCOTT CONNER,
and LEONA VIGIL, in their individual and
official capacities,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

Luis Lopez was a sergeant with the Belen Police Department (BPD) and the president of AFCSME Local 601 (the Union). Displeased with the performance of BPD Deputy Chief Robert Miller, Lopez initiated a "vote of no confidence" that 9 of the 13 Union members signed. Lopez sent a letter outlining the Union's issues with Miller and reporting the vote to BPD Chief of Police Scott Conner, City Manager Leona Vigil, the Belen Mayor and City Council, and the local newspaper. Vigil hired an outside firm to investigate the allegations against Miller, which concluded that they were largely unfounded. Lopez was terminated from his position with the BPD and appealed his termination to the Belen Labor Management Relations Board. The Board, considering witness testimony and the same investigative report that the City relied on to fire Lopez, concluded that the City unlawfully terminated Lopez for union-related activities.

Shortly before the Board issued its decision, Lopez tragically committed suicide. The City appealed the Board's decision, and the state court has reversed it, but the matter is not yet final. Ana Lopez, Lopez's mother and the personal representative of his estate, filed a lawsuit in state court under 42 U.S.C. § 1983 for damages arising from the alleged violation of Lopez's rights

under the First Amendment to free speech and to associate with a union. Defendants removed the lawsuit to this Court and now move for summary judgment on qualified immunity grounds on the claims against Vigil and Conner and for summary judgment on the claim against the City. For the reasons discussed herein, the Court will grant Defendants' motion.

## I.    Legal Standards

### A.    Standard for Motions for Summary Judgment

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* (quotation and citations omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in her favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

### B.    Qualified Immunity Standard

The Court reviews summary judgment motions based on a qualified immunity defense

somewhat differently. *See Halley*, 902 F.3d at 1144. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct [was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (internal quotation marks omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d at 1144 (quoting *Thomson*, 584 F.3d at 1312).

## II.   Collateral Estoppel

Before summarizing the facts at issue in this lawsuit, the Court must resolve a dispute

regarding collateral estoppel. In response to his termination, Mr. Lopez filed a Prohibited Practice Complaint against the City of Belen. (*See* Doc. 18-3.) The Board held hearings on his complaint and issued a ruling in Lopez's favor. (*See* Doc. 18-1.) The City appealed to the 13th Judicial District Court, Valencia County, New Mexico. (*See* Doc. 18-9.) The state court issued Findings of Fact and Conclusions of Law on June 11, 2020, and a Final Order on June 19, 2020, but the time to appeal has not yet run.[1] *See City of Belen v. Lopez*, No. D-1314-CV-2019-00923, Findings of Fact & Conclusions of Law (13th Jud. Dist., Valencia Cty., N.M. June 11, 2020); Final Order (June 19, 2020).

In her response, Ms. Lopez contends that "claim preclusion should prevent Defendants from asserting" certain facts and that "the findings of the Labor Board . . . defeat the instant motion for summary judgment." (Doc. 18 at 3.) The Court disagrees. "[C]ollateral estoppel promotes judicial economy and protects parties from endless relitigation." *Deflon v. Sawyers*, 137 P.3d 577, 582 (N.M. 2006) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)). The party asserting collateral estoppel must prove four elements. *See Reeves v. Wimberly*, 755 P.2d 75, 79 (N.M. Ct. App. 1988) (citations omitted). First, "the party against whom collateral estoppel is asserted must be the same party or be in privity with the party to the original action;" second, "the subject matter or the cause of action in the two suits must be different;" third, "the ultimate facts or issues must have been actually litigated;" and fourth, "the issue must have been necessarily determined." *State v. Bishop*, 832 P.2d 793, 795 (N.M. Ct. App. 1992) (citing *Reeves*, 755 P.2d at 77 (internal citations omitted)).

---

[1] The court held that because no representative or successor in interest continued the proceedings on Lopez's behalf after his death in January 2019, the Board lacked jurisdiction to enter findings on Lopez's Prohibited Practices Complaint and grievance in February 2019. *City of Belen v. Lopez*, No. D-1314-CV-2019-00923, Findings of Fact & Conclusions of Law at *3–5 (13th Jud. Dist., Valencia Cty., N.M. June 11, 2020). The court did not review the substantive issues raised by the City. *Id.*

Ms. Lopez does not discuss the elements of collateral estoppel. (*See* Doc. 18.) She does, however, eventually acknowledge that the Board's findings may only "be entitled to preclusive effect" *if* "the determination is upheld on review . . . ." (*Id.* at 13 (citation omitted).) "[C]ollateral estoppel appl[ies] only to final judgments." *C& H Const. & Paving Co. v. Citizens Bank*, 597 P.2d 1190, 1200–01 (N.M. Ct. App. 1979) (citations omitted). Ms. Lopez further asserts that even though the action is not final, the Board's "findings are sufficient to defeat" the motion for summary judgment. (Doc. 18 at 13.) Ms. Lopez does not cite any authority to support this contention. (*See id.*) To rely on those findings would be to give them preclusive effect, which the Court may not do. Because the state action is not final, collateral estoppel does not apply here. The Court will not give preclusive effect to the Board's findings.

Further, Ms. Lopez repeatedly objects to Defendants' statement of material facts on the basis that the facts are refuted by the Board's findings. (*See*, *e.g.*, Doc. 18 at 5–7.) To the extent that Ms. Lopez objects solely on the basis that facts are disputed by Board findings, her objections are overruled.

## III.    Statement of Facts[2]

Lopez was a sergeant with the BPD and president of the Union in 2017. (Compl. ¶¶ 8–9.) On May 10, 2017, Lopez, in his capacity as president of the Union, sent a letter to Conner, Vigil, the City Council and mayor, and the local newspaper. (*Id.* ¶¶ 4–5, 10; Doc. 16-B-2.) The letter informed City leaders that "[b]y an overwhelming majority," Union members had "voted no confidence on Miller and his subversive management style." (Doc. 16-B-2 at 23.[3]) The letter

---

[2] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to Ms. Lopez. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[3] The Court cites to the CM/ECF pagination for the exhibits, rather than to the internal pagination.

outlined eight distinct issues the Union had with Miller. (*See id.* at 23–24.) It specified that it was not the Union's "intent to reflect negatively on Chief Conner's leadership" and stated that Union members believed "the only path forward which maintains and protects public safety and the integrity of" the BPD was for "City Leaders to immediately demand the resignation of Deputy Chief Miller." (*Id.* at 24.) The local newspaper ran an article on the Union's vote, which repeated the Union's allegations against Miller and quoted Lopez, Conner, Miller, and others from the BPD. (Doc. 16-B-3.)

On the following day, Vigil received three emails from BPD officers disavowing the Union vote. (*See* Docs. 16-B ¶ 7; 16-B-4—16-B-6.) Vigil decided to hire an outside firm—Robert Carswell Investigations (RCI)—to investigate the Union's allegations. (Doc. 16-B ¶ 8.) RCI interviewed 11 witnesses and examined documents.[4] (*See* Doc. 16-B-1.)

Below are the Union's eight issues with Miller as outlined in the letter (underlined), followed by the RCI investigators' relevant findings.

(1) "Miller has created a hostile working environment which compromises public safety." (Doc. 16-B-2 at 23.) Lopez told the investigators that Miller made "life hard for him" and made "fun of him in front of other officers[,]" but was unable to give a specific example. (Doc. 16-B-1 at 9.) Lopez said that one day Miller "storm[ed] around the office saying 'I'm a tyrant. I'm an oppressor.'" (*Id.*) Miller admitted he did this one time "several years ago" after Lopez "sent a letter to City Hall and to the chief stating that the police administration were all tyrants and oppressors."

---

[4] Before each interview, the RCI investigators informed the officers: "You are compelled to truthfully answer my questions in this investigation. Failure to do so will subject you to disciplinary action, the severity of which could be termination from employment." (Doc. 18-6 at 8.) Additionally, Vigil sent Lopez a letter on June 1, 2017, that informed him he was "required to bring forth any information or evidence regarding" the investigation. (Doc. 18-7.) The RCI investigators asked Lopez to turn over a copy of the Union signature form on the vote of no confidence, and Lopez complied. (Doc. 18-6 at 37.)

(*Id.*) Lopez also stated that Miller denied his request "to carry a personally-owned firearm . . . ." (*Id.*) Miller explained, though, that the denial occurred because Lopez knowingly failed to comply with a requirement that officers get qualified on a specific range. (*Id.*)

Interviews of other officers revealed "that the work environment has been tense since Sgt. Lopez produced [the vote of no confidence] letter," but only one officer—Ed Vonkutzleben—"felt that a hostile work environment may exist." (*Id.*) Vonkutzleben asserted that he has been "targeted" by the Administration ("not just Deputy Chief Miller") by an "excessive" disciplinary action for missing court. (*Id.* at 10.) The investigators found no evidence that Miller had created a hostile work environment and that the "behavior in question was proper in terms of the requirements of applicable law and departmental directive." (*Id.*) The investigators "recommend[ed] that Deputy Chief Miller be exonerated on this charge." (*Id.*)

(2) "Miller has demonstrated behavior unbecoming of an officer during belligerent interactions with the public." (Doc. 16-B-2 at 23.) Of the nine officers interviewed on this issue, only Lopez mentioned the allegation, while "[s]everal officers said that [it] is completely false." (Doc. 16-B-1 at 10.) Lopez alleged that Miller called a homeless man a "dog" during a police interaction. (*Id.*) Miller admitted that he called the man a dog after the man called him a dog, but it was not a violation of policy. (*Id.*) Lopez alleged that Miller told Los Lunas Police Department officers why former BPD Officer Priese was terminated. (*Id.*) Miller admitted he told the officers that "Priese was a jerk" who "could not get along with other officers or anyone else[,]" but he did not tell them why Priese was fired. (*Id.*) The investigators concluded that the second allegation was "unfounded." (*Id.* at 11.)

(3) "Miller violates chain of command and does not conduct proper investigations of officer decisions. Instead, Miller has a pattern of flippantly criticizing officers and supervisors in open

meetings." (Doc. 16-B-2 at 23.) Lopez relayed a story about BPD Officer Gordon, who "engaged in a vehicle pursuit" that went "out of jurisdiction." (Doc. 16-B-1 at 10.) Lopez and Miller disagreed about the propriety of the pursuit. (*See id.*) Miller discussed the incident outside of the presence of Lopez, and Lopez felt that Miller should have brought all involved officers together to talk. (*Id.*) RCI investigators opined that Miller's actions "did not appear to violate chain of command since the officers" were within Miller's "span of control . . . ." (*Id.*) "Lopez admitted that he was not familiar with chain of command policy." (*Id.*) No other officers had concerns about chain-of-command violations, and the investigators recommended that Miller be exonerated on this allegation. (*Id.*)

(4) "Miller undermines the authority and actions of supervising officers and the chief, which leads to a breakdown in orderly operations at [BPD]." (Doc. 16-B-2 at 23.) Here, Lopez stated that Miller anonymously sent a letter to the City Council and the Attorney General's office alleging that Conner "requir[ed] officers to profile and thus to conduct illegal activity." (Doc. 16-B-1 at 12; *see also id.* at 5 (describing anonymous letter).) Lopez admitted that he had not seen the letter and had heard about it from Sergeant Keck. (*Id.* at 12.) Keck told investigators that he had never seen the letter but heard about it from Lieutenant Portio. (*Id.*) Portio told investigators he never discussed the letter with Keck, but he had heard Miller complain about profiling "in open meetings[,]" and Miller's stance on profiling was common knowledge. (*Id.*) Miller denied writing the letter and admitted he has had "issues with some orders that Chief Conner has put out in the past" but "that he is not afraid to bring issues up when he has a problem." (*Id.*)

Both Lopez and Keck alleged that Miller "worked to undermine" Conner by asking them why the Union was not doing something about the "profiling issue" and the fact that Conner eats for free at two local establishments. (*Id.* at 13.) Keck asserted that Portio was present at one of

these conversations, but Portio denied that. (*Id.*) Miller stated "that he has never gone to the [U]nion to complain[,]" but he has told officers with "gripes" "to go to the [U]nion if they had a complaint." (*Id.*) The RCI investigators "found that there is insufficient evidence either to prove or disprove the [fourth] allegation" and, therefore, it "is not sustained." (*Id.*)

(5) "Miller wrongly challenges and retaliates on officers over their interpretations of criminal law and enforcement decisions." (Doc. 16-B-2 at 23.) Lopez asserted that Miller placed a GPS unit on Officer Hall's vehicle after an accident, but acknowledged that it was due to a policy violation. (Doc. 16-B-1 at 13–14.) In another instance, Miller advised two officers via a written memo that they had unlawfully sealed a vehicle while waiting for a search warrant. (*Id.* at 14.) Lopez did not explain how Miller's conduct was retaliatory and admitted that none of the officers involved were disciplined. (*Id.* at 14–15.) The investigators reviewed the memo and determined that it was not inappropriate. (*Id.* at 15.) They found that the fifth allegation was unfounded. (*Id.*)

(6) "Miller's actions have had a chilling effect on officers, and are fostering a culture of hesitation and fear. This is especially dangerous in the field of law enforcement, where officers must making [sic] split-second decisions to pursue offenders, and otherwise enforce the law." (Doc. 16-B-2 at 24.) The investigators found that it was "impossible to investigate this . . . vague and subjective" allegation, which "does not correspond to any listed Department policy violation." (Doc. 16-B-1 at 15.) Further, only Lopez and Vonkutzleben agreed with this allegation. (*Id.*)

(7) "Despite warnings, Miller has on several occasions, inappropriately slandered or disparaged officer[s'] professional conduct with parties outside [BPD], potentially 'blacklisting' current and former department employees." (Doc. 16-B-2 at 24.) Lopez again raised the issue of Miller discussing Priese's termination and placing the GPS unit on Hall's vehicle. (*Id.* at 15–16.) Miller explained that the former chief put the GPS unit on Hall's vehicle because it was well-

known that Hall sped everywhere. (*Id.* at 16.) The investigators found that of the incidents they heard about, Miller has made one disparaging remark—about Priese—which was not against policy as Priese was not a current employee. (*Id.*)

(8) <u>"Miller is unapproachable when agitated and incapable of preventing his personal issues from interfering with his professional conduct."</u> (Doc. 16-B-2 at 24.) The investigators noted that there was "no corresponding SOP violation for this allegation[,]" which "is vague and subjective and could apply to nearly every person who has ever worked in a professional capacity." (Doc. 16-B-1 at 16.) Miller admitted he has been under stress and has been moody, but every officer interviewed admitted that they had been moody or brought stress to work at times. (*Id.*)

<u>Whether Lopez accurately represented the vote of no confidence.</u> Lopez stated that Sgt. Chavez assisted him in soliciting signatures, but none of the officers interviewed corroborated that assertion. (*Id.* at 16–17, 19.) Lopez admitted he had not shown the letter that accompanied the vote of no confidence to any other officer before asking them to sign. (*Id.* at 17.) Lopez also admitted that he solicited signatures during duty hours. (*Id.*) The RCI investigator asked Lopez if he "ever represented that this was a vote of no confidence for Deputy Chief Miller or if this was a vote supporting the Chief." (*Id.*) "Lopez responded that it was represented that they supported the Chief and the direction the department was headed." (*Id.*) The investigator "asked if an officer could have been signing for a vote of support for Chief Conner instead of as a vote of no confidence for Deputy Chief Miller." (*Id.*) Lopez responded "that he felt that it was explained in full detail what they were signing for, a vote of no confidence." (*Id.*)

Other officers seemed unclear about what they had signed. Officer Hernandez stated that Lopez had not discussed any of the issues that were in the letter during the conversation about the

vote. (*Id.*[5]) Hernandez also reported that "Lopez told him that he should sign the letter because 'if Deputy Chief Miller hasn't done you wrong[,] he will.'" (*Id.*) "Officer Richards said that she never heard anything about a vote of no confidence" but understood the petition as support for Conner. (*Id.* at 18.) Richards "would not have signed the letter had she known that" Lopez would accompany it with the letter listing issues against Miller. (*Id.*) Officer Cordova, who did not sign the vote, stated that Lopez had discussed issues about Miller and "details about what the petition was about[,]" including details about blacklisting an employee and how Miller's personal life interferes with his work. (*Id.*) Cordova told "Lopez that he wanted nothing to do with any of that." (*Id.*) Officer Rivera said that when Lopez talked to him, he mentioned that Miller had sent a letter to the Attorney General's Office about Conner and that "Miller intimidates people when he is having a bad day." (*Id.* at 19.) Rivera said he would not have signed the vote if he had known about the letter. (*Id.*) Keck stated he had not seen the letter, "the letter did not reflect his reasons for signing the petition[,]" and "he wished he had never signed" it. (*Id.*) "With the exception of Officer Vonkutzleben, every officer who signed the letter said that they would not have signed had they seen the accompanying letter." (*Id.*)

Based on the forgoing interviews, the RCI investigators concluded that they "found ample evidence to determine that Sgt. Lopez misrepresented the vote of no confidence and that he was not honest with officers about the issues he represented when he asked them to sign that petition."[6]

---

[5] Ms. Lopez objects to the admission of the investigative findings on two grounds. (Doc. 18 at 5–6.) First, she asserts that the "findings were explicitly rejected by the Belen Labor Board . . . ." (*Id.*) The Labor Board's findings are not entitled to preclusive effect, however, and this objection is overruled. Second, she contends that the investigation represented an unlawful coercion of the Union members in violation of the BPD's Labor Relations Ordinance. (*Id.* at 5.) Again, she explicitly bases this contention on one of the Board's findings, which is not entitled to preclusive effect. (*See id.*) As Ms. Lopez does not provide any other valid basis for her objections to the findings of the RCI investigative report, her objections are overruled.

[6] Ms. Lopez cites to audio files of testimony recorded at the Board hearing to support the contention that Officers Vonkutzleben, Skopek, and Sullenger testified "that they were fully briefed by Sgt. Lopez about both the

(*Id.* at 16.) They also opined that "Miller may have been exposed to a hostile work environment"

and that Lopez's contentions in the letter were "untrue, unprovable or just plain slanderous." (*Id.*

at 19.)

Relying on the findings in the investigative report, Conner recommended that Lopez's

employment be terminated. (Doc. 16-A ¶ 12.) This recommendation came despite the fact that

Miller had given Lopez a "sterling evaluation as a police officer" just a few months prior.[7] (*See*

Doc. 18-10 at 56:18–23.) Conner gave Lopez notice of the proposed termination first on July 18,

2017, and the City of Belen provided an amended notice on July 24, 2017.[8] (Doc. 16-A ¶ 14; *see*

*also* Docs. 18-2; 18-4; 18-5.) The notice provided:

> During the course of [the RCI] investigation it was discovered that Sgt. Lopez asked
> officers to sign a document in support of Police Chief Scott Conner and the
> direction the department was headed. Several Officers . . . [stated that] they were
> misinformed by Sgt. Lopez when asked to sign this document, and had they known
> it would be submitted as a "vote of no confidence" against Deputy Police Chief
> Robert Miller they would not have signed, as they did not agree with the allegations
> set forth.
>
> It was also discovered . . . that while attempting to get a signature from one of the
> Officers "Sgt. Lopez attempted to intimidate the Officer by saying that if Deputy
> Chief Miller hasn't got you yet, he will."
>
> It was also noted by investigators that Deputy Police Chief Miller may have been
> exposed to a hostile work environment . . . [because] the allegations made by Sgt.
> Lopez are either untrue, unprovable or just plain slanderous.

---

circumstances giving rise to the petition and the purpose of the vote of no confidence." (*See* Doc. 18 ¶ 30 & at 9 nn.
1–3.) Defendants object to the audio files as they "rely on the Labor Board hearing and findings and are not admissible
evidence." (Doc. 22 at 4.) Regardless, the audio files do not contradict the investigative findings before the Court, nor
do they suggest that Conner or Vigil had this information when the termination decision was made. The same is true
for an audio recording between Lopez and Richards. (*See* Doc. 18-13.) Thus, any dispute is not relevant.

[7] While Miller made this statement at the Board hearing, Defendants lodged no objection to the testimony (and
erroneously attributed it to Conner). (*See* Doc. 22 at 5 n.1.)

[8] The original notice of termination was rescinded and replaced on July 24, 2017. (*See* Docs. 18 at 3–4; 18-2; 18-4;
18-5.) Ms. Lopez states that "[t]he two notices are extremely similar and make repeated reference to . . . Sgt. Lopez's
activities relating to the Union Petition. The primary difference between the two is that the second notice was sanitized
to remove the repeated use of the word 'Union' in the first notice of termination." (Doc. 18 at 4; *compare* Doc. 18-2,
*with* Doc. 18-5.)

> Additionally, the investigators noted that "ample evidence was found to determine that Sgt. Lopez misrepresented the vote of no confidence and that he was not honest with officers about issues he represented when he asked them to sign the petition."
>
> As a direct result of these very serious policy infractions . . . , I find there are serious violations of the . . . reference[d] policies/provisions sufficient to consider termination of your employment.

(Doc. 18-5 at 2–3.) The notice of termination stated that Lopez violated the following:

(1) BPD Policy and Procedure PER-02-01-2 F: "All employees must respect civil rights laws and refrain from discriminatory actions. It is everyone's responsibility to perform official duties in a way that maintains and fosters a non-hostile work environment free from discrimination." (*Id.* at 1.)

(2) BPD Policy and Procedure PER-09-01-7: "Falsification of any reports"; "Threatening or coercing employees or supervisors"; "Engaging in dishonest or immoral conduct that undermines the effectiveness of the agency's activities or employee performance, whether on or off the job"; and "Taking any action, which will impair the efficiency or reputation of the department, it's [sic] members, or employees." (*Id.*)

(3) BPD Policy and Procedure ADM.01.02-5: BPD "members . . . are expected to conduct themselves in accordance with statutory limits and guidelines of this manual, and in such manner as would reflect favorabl[y] upon themselves and on the Department."

(4) BPD Policy and Procedure ADM.33.01: "[C]redibility [is] an essential requirement of being able to function as a police officer." (*Id.* at 2 (emphasis omitted).)

(5) Collective Bargaining Agreement (CBA) between the City of Belen and AFSCME Council 18 Article 3.1.2: "The Union shall not use City time, equipment, property or materials for Union business." (*Id.*)

(6) CBA Article 5.2: "The City and the Union agree that employees should be provided a workplace that is free of harassment." (*Id.*)

The City held a Pre-Determination Hearing on August 3, 2017. (*See* Doc. 16-B-2 at 41.) While the City gave Lopez "the opportunity to respond to each of the alleged violations and contemplated disciplinary action[,]" Lopez "chose not to respond to the actual charges[] but did admit [he] should have done things differently." (*Id.*) After reviewing Lopez's disciplinary history and considering the evidence, Vigil made the final decision to terminate Lopez's employment. (*Id.*) Vigil averred that she "had to spend substantial time trying to publicly defend [the] City government and [the BPD]." (Doc. 16-B ¶ 11.) She was "concerned that if [she] could not trust him to be truthful with City officials and his fellow officers," she would also be unable to "trust him to be truthful in his dealings with the public. Given the [investigative] findings, [she] agreed that Lopez could no longer serve as an effective police officer for the City of Belen." (*Id.*)

Conner stated that it was his perception that the letter created "distrust and division" among the officers and a poor image of the BPD and his leadership in the eyes of the public. (Doc. 16-A ¶¶ 17–18.) Conner "believed that termination was justified because the honesty of a police officer is critical in" dealing with fellow officers, superiors, the public, and the criminal justice system, and "[o]nce an officer's honesty is impugned, his or her effectiveness is substantially diminished on all fronts." (*Id.* ¶ 19.) Both Vigil and Conner averred that the decision to terminate was not based on Lopez's involvement with the Union, but with the dishonesty relating to the letter.[9] (Docs. 16-A ¶ 20; 16-B ¶ 13.)

---

[9] Ms. Lopez objects to Vigil's and Conner's statements on the basis of the Board's findings, and as "an improper attempt to get a ruling on the merits of the underlying claim prior to discovery . . . ." (Doc. 18 at 7.) She does not, however, request additional discovery on this matter. These statements were included in an affidavit and are limited to the declarants' perception. The Court overrules the objections.

14

Lopez filed a Prohibited Practice Complaint with the Board on July 19, 2017, alleging that the City retaliated against him for his involvement with the Union. (Doc. 18-3.) The Board held three hearings in January, February, and December 2018. (*See* Doc. 18-9 at 2.) "Lopez passed away on January 10, 2019, after evidence had been presented but before the parties had submitted their post hearing briefs to the Board." *City of Belen*, No. D-1314-CV-2019-00923, Findings of Fact ¶ 7. The City challenged the Board's jurisdiction to continue the proceedings after Lopez's death and moved to dismiss the matter. *Id.* ¶ 8. The Board denied the motion and entered its findings in Lopez's favor. *Id.* ¶ 11. (*See also* Doc. 18-9 at 2.) The City appealed on July 26, 2019. (*See* Doc. 18-9 at 1.) On August 9, 2019, Ms. Lopez, as personal representative of Lopez's estate, filed a complaint in state court for violations of Lopez's First Amendment free speech and associational rights under 42 U.S.C. § 1983. (*See* Doc. 1-A.) Defendants removed the complaint to this Court on September 16, 2019. (Doc. 1.) Defendants moved for Summary Judgment on the basis of qualified immunity on January 10, 2020, and that motion is now ripe. (Doc. 15.) The state court recently entered Findings of Fact and Conclusions of Law, finding that the Board did not have jurisdiction to enter a decision after Lopez died. *City of Belen*, No. D-1314-CV-2019-00923, Findings of Fact ¶ 9. That matter is not yet final.

**IV.    Analysis**

Ms. Lopez contends that in terminating Lopez, Defendants retaliated against him for exercising his constitutional rights to associate with the Union and to free speech. (Compl. ¶¶ 26–43.) Defendants argue that Ms. Lopez fails to demonstrate a constitutional violation under these circumstances.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Couch v. Bd. of Trs. of Mem'l Hosp. of*

*Carbon Cty.*, 587 F.3d 1223, 1235 (10th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). "Therefore, 'a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech.'" *Id.* (quoting *Dill v. City of Edmond, Okla.*, 155 F.3d 1193, 1201 (10th Cir. 1998)); *see also Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1437 (10th Cir. 1990) ("Public employees may not be retaliated against for 'speech on a matter of public concern,' i.e., 'political, social, or other concern to the community.'") (quotation omitted). The Court uses the five-part *Garcetti/Pickering* test to analyze freedom-of-speech retaliation claims. *Couch*, 587 F.3d at 1235; *see also Sinfuego v. Curry Cty. Bd. of Cty. Comm'rs*, 360 F. Supp. 3d 1177, 1241 (D.N.M. 2018) (analyzing the plaintiff's claims that defendant violated her rights to freedom of speech, freedom to petition for grievances, and freedom of association together "under the Tenth Circuit's five-part test for First Amendment freedom-of-speech retaliation claims").

Under this test, the Court first "determine[s] whether the employee speaks 'pursuant to [his] official duties.'" *Brammer-Hoelter v. Twin Peaks Carter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 421). If so, "then there is no constitutional protection . . . ." *Id.* (quotation omitted). "Second, if an employee . . . speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern." *Id.* (citations omitted). If it is not, "then the speech is unprotected and the inquiry ends." *Id.* "Third, if the employee speaks as a citizen on a matter of public concern, the court must determine 'whether the employee's interest in commenting on the issue outweighs the interest of the state as employer.'" *Id.* (quoting *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007)). "Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a 'substantial factor or a motivating factor in a detrimental employment decision.'" *Id.*

16

(quoting *Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1338 (10th Cir. 2000)). If it was a substantial "factor, 'the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.'" *Id.* (quoting *Lybrook*, 232 F.3d at 1339). Defendants acknowledge that because Lopez sent the letter on behalf of the Union, he was speaking as a private citizen on a matter of public concern. (Docs. 16 at 10; 22 at 10.) Thus Defendants focus only on the third prong.

> **A.**    **On balancing the parties' interests, the Court finds that the City's interest in an efficient and disciplined workplace outweighs Lopez's interest in the speech at issue.**

Under the third prong, the Court must determine whether Lopez's interest in the speech about Miller outweighed the interest of the City in avoiding workplace disruption caused by the speech. "[T]here is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment." *Brammer-Hoelter*, 492 F.3d at 1207 (quoting *Casey*, 473 F.3d at 1333). "Nevertheless, the question is whether the employer 'has an efficiency interest which would justify it in restricting the particular speech at issue.'" *Id.* (quoting *Cragg v. City of Osawatomie, Kan.*, 143 F.3d 13443, 1346 (10th Cir. 1998)). "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). "Pertinent considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quoting *Rankin*, 483 U.S. at 388). "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest

in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.'" *Id.* (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989)). It is the employer's burden to show it was justified in regulating the employee's speech. *Id.* "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Cragg*, 143 F.3d at 1346 (quoting *Rankin*, 483 U.S. at 384).

Defendants contend that Lopez's speech caused disruption within the BPD. Ms. Lopez argues that any tension was "in response to the disruption caused by Deputy Chief Miller" (Doc. 18 at 17 (emphasis omitted)), but she cites no evidence in support. Instead, the record shows that after the letter was published in the newspaper, Vigil received emails from three BPD officers who disavowed the letter (none of whom had signed the petition). (Docs. 16-B-4–B-6.) And the newspaper article itself evidences disagreement among officers on the subject of Miller. (*See* Doc. 16-B-3.) Officer Cordova is quoted as saying that "he was surprised to see the letter" and thought there were "one or two people unhappy and [who] want to get [Miller] fired." (*Id.* at 28–29.) Natividad told the newspaper that "he believes Lopez has a vendetta against Miller." (*Id.* at 29.) In a small police department like the one here, distrust and dissension among the officers could cause significant disruption. *Cf. Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 93–94 (D. Mass. 2003), *aff'd sub nom.*, 404 F.3d 504 (1st Cir. 2005) (finding that plaintiff's interest in speech outweighed police department's interest in efficiency in part because "it is hard to imagine that . . . the complaints of one officer of a relatively large police force would either disturb the delicate balance of the workplace or significantly damage employee morale); *Biggs v. Village of Dupo*, 892 F.2d 1298, 1303–04 (7th Cir. 1990) (discharge of police officer after critical interview in paper

unlawful where interview caused no disruption in police force).

Defendants also point to the RCI investigation, which revealed "that the work environment ha[d] been tense since Sgt. Lopez produced [the vote of no confidence] letter . . . ." (Doc. 16-B-1 at 9.) At least four of the nine officers who signed (Richards, Chavez, Rivera, Keck) said they would not have signed had they read the letter, or that they regretted signing after seeing the letter. (*Id.* at 18–19.) And critically, Lopez admitted that he had not shown anyone the letter that was published with the petition. (*Id.* at 17.) Ms. Lopez asserts throughout her brief that the City unlawfully coerced Union members by forcing their participation in the investigation (*see*, *e.g.*, Doc. 18 at 16–17), but she does not bring a cause of action on this basis, nor does she develop an argument or cite authority to establish that Defendants unlawfully relied on the investigatory findings in making the termination decision. The Court finds that the public airing of grievances, the public newspaper commentary alleging friction between Lopez and Miller, and the investigatory findings that Union members did not understand what they were signing, support Defendants' claim that Lopez's speech caused disruption at the BPD and affected employee morale. *See Weaver v. Chavez*, 458 F.3d 1096, 1103 (10th Cir. 2006) (finding that city attorney's complaints about promotions and new hires impaired discipline, interfered in the recruiting process, and undermined morale, and thus the balance of interests favored the employer).

Defendants also argue that the City did not terminate Lopez "for his speech or association with the labor union, but rather [for] his untruthfulness in presenting his contention that the Union supported the vote of no confidence, as well as the resulting disruption to the efficient operation of the [BPD]." (Doc. 16 at 11.) "The truth or falsity of an employee's speech is in itself a factor that is relevant in striking the balance between the employee's right to free speech and the government's interest in efficient administration." *Díaz-Bigio v. Santini*, 652 F.3d 45, 54 (1st Cir.

2011) (citations omitted). Ms. Lopez responds that Defendants' argument is precluded by the Board's findings, as "there was no credible evidence before the Labor Board that [Lopez] was dishonest."[10] (Doc. 18 at 14.) But the evidence before the Board is not at issue; rather, the Court must examine what information Defendants had when making the termination decision.

Ms. Lopez does not dispute that investigators could not corroborate many of the allegations in the letter. (Doc. 18 at 5.) The investigation found that of the eight issues listed, (1) only Lopez and Vonkutzleben felt that Miller created a hostile work environment; (2) only Lopez mentioned that Miller had demonstrated unbecoming behavior or belligerent interactions with the public, and "[s]everal officers said that [the allegation] is completely false"; (3) only Lopez had concerns about chain-of-command violations; (4) only Lopez and Keck alleged that Miller "worked to undermine" Conner, thus there was insufficient evidence to prove the allegation; (5) there was no basis in fact for the fifth allegation about Miller wrongly challenging or retaliating against officers; (6) only Lopez and Vonkutzleben agreed that Miller's actions had a chilling effect on officers; (7) investigators found only one instance of Miller making a disparaging remark, but the target was not a BPD employee; and (8) there was no corresponding SOP for the allegation that Miller was moody and allowed his personal problems to interfere at work.) (Doc. 16-B-1 at 9–16.)

The facts of this case are similar to those in *Díaz-Bigio*, 652 F.3d 45. In that case the plaintiff, a health department employee and union president, made statements to print and radio media alleging that the health department's executive director had a serious conflict of interest. *Id.* at 46. "The city immediately investigated these charges, and Díaz-Bigio was twice issued a

---

[10] Ms. Lopez cites only one case in her argument regarding the third prong of the inquiry: *Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013). (*See* Doc. 18 at 17.) Yet the third prong was not at issue in *Ellins*. *See* 710 F.3d at 1056. Rather, "the district court held that Ellins failed to establish that (1) he spoke as a private citizen in leading the no-confidence vote; (2) he suffered an adverse employment action; and (3) his protected act was a substantial or motivating factor in the alleged adverse employment action." *Id.* Thus *Ellins* is inapposite.

summons to provide testimony in support of her allegations, but she refused to do so." *Id.* Based on the investigation, the city found that the plaintiff's allegations were groundless, and it terminated her employment. *Id.* She sued for violations of her First Amendment rights. *See id.* The First Circuit noted that "the fact that a statement is recklessly false may well create a presumption that the employee's interest in uttering it is subordinate to the government's interest in suppressing it." *Id.* at 55 (quotation and citation omitted). Here, Defendants have presented persuasive evidence to show that reasonable officials could have concluded, based on the facts known at the time of the termination decision, that Lopez's statements were largely or entirely groundless.

Defendants do more than make "purely speculative allegations" of disruption to the BPD due to Lopez's speech, they have shown evidence of actual disruption caused by the groundless allegations. *See Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) (quoting *Cragg*, 143 F.3d at 1347). On the undisputed facts of record, the balance of interests weighs in favor of the City's interest in avoiding workplace disruption caused by the speech. As a result, Lopez's "speech was not entitled to First Amendment protection[,]" *see Weaver*, 458 F.3d at 1104, and the Court need not consider the fourth and fifth factors of the *Garcetti/Pickering* test.

> **B.      Conner and Vigil are entitled to qualified immunity.**

Conner and Vigil are entitled to qualified immunity because Ms. Lopez failed to establish that Defendants violated Lopez's First Amendment rights. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Even if a jury could have found that a constitutional violation occurred, the Court finds that Conner and Vigil would be entitled to qualified immunity under these circumstances.

To defeat Defendants' assertion of qualified immunity, Ms. Lopez must show that Defendants violated Lopez's First Amendment rights and that those rights were clearly established. *See Halley*, 902 F.3d at 1144. "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). "In determining whether the law was clearly established," the Tenth Circuit recognizes "that allegations of constitutional violations that require courts to balance competing interests may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity." *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992), *overruled in part on other grounds by Williamson v. City & Cty. of Denver*, 99 F.3d 1009, 1014–15 (10th Cir. 1996) (citations omitted).

Ms. Lopez does not carry her burden to show any authority on point. Instead, she reiterates the Board's findings (Doc. 18 at 2, 12–14) and emphasizes that Lopez was addressing a matter of public concern (*id.* at 13–14). These points are insufficient to show that, based on the outcome of the balancing of interests, the law was so clear that all reasonable officials were on notice that firing Lopez would violate his First Amendment rights under these facts. *See Díaz-Bigio*, 652 F.3d at 52. Accordingly, Conner and Vigil are entitled to summary judgment on the grounds of qualified immunity.

### C.      Ms. Lopez's claim against the City also fails.

Ms. Lopez also brings a claim for municipal liability against the City for actions taken by Vigil. (*See* Doc. 18 at 18 ("Because it is [Vigil's] decision to terminate [Lopez's] employment . . . that is at issue, the City is liable for her actions.").) "[T]o establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link

between the policy or custom and the injury alleged." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1212 (D.N.M. 2015) (citing *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)). Because Ms. Lopez failed to demonstrate a First Amendment violation, her claim against the City necessarily fails. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.") (citations omitted).

Ms. Lopez objects to a decision on her claims against the City on the basis that United States Magistrate Judge Jerry H. Ritter allowed a delay of the entry of a scheduling order for Defendants to file a qualified immunity motion, not a motion for summary judgment related to municipal liability. (*See* Doc. 18 at 11 (citing Doc. 14).) While Judge Ritter's order did not specifically allow for a motion on municipal liability, the Court finds Defendants' motion on this issue proper. Ms. Lopez does not explain how further discovery would allow the municipal liability claim to go forward where she has failed to establish a constitutional violation. Dismissal of her claims against the City is proper.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment of Defendants the City of Belen, Scott Conner and Leona Vigil (Doc. 15) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**.


_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE